IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

DANNY LEE GRALL,

        Plaintiff,

v.                                                    Civil Action No. 2:14-cv-45

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

**A. Background**

On June 13, 2014, Plaintiff Danny Lee Grall ("Grall" or "Plaintiff"), proceeding *pro se*, filed this action for judicial review of an adverse decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act. ECF No. 1. The Commissioner filed her answer on January 16, 2015. ECF No. 16. Plaintiff then filed his motion for summary judgement on February 20, 2015. ECF No. 20. The Commissioner filed her motion for summary judgement on March 23, 2015. ECF No. 21. The motions are now ripe for this Court's review and report and recommendation.

**B. The Pleadings**

    1.    Plaintiff's motion for summary judgement. ECF No. 20.

    2.    The Commissioner's motion for summary judgement. ECF No. 21.

**C. Recommendation**

    I recommend that:

    1.    Plaintiff's motion for summary judgment be **DENIED** because substantial evidence

supports the ALJ's finding that Grall was not disabled as defined in the Social Security Act during the relevant period from October 28, 2009, through June 30, 2010.

2. The Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

**A. Procedural History**

On October 19, 2007, Grall filed for DIB and supplemental security income ("SSI"). R. 56. His claims were denied on January 29, 2008, and upon reconsideration on May 8, 2008. *Id.* On August 7, 2008, an administrative law judge ("ALJ") hearing was held before ALJ J.E. Sullivan. R. *Id.* On October 27, 2009, ALJ Sullivan found that Grall had "not been under a disability, as defined in the Social Securit Act, from May 4, 2007 through the date" of her decision. 66-67. On March 3, 2011, the Appeals Council denied Grall's request for review. R. 72-75.

On April 18, 2011, Grall again applied for DIB now alleging a disability beginning on October 28, 2009, the day after the unfavorable decision by ALJ Sullivan. R. 10, 53-67, 150. Grall alleged an onset of disability due to herniated discs, back injury, arthritis, chronic pain, fractures and varicose vein issues in his leg, circulation problems in his leg, anxiety and depression, one leg being shorter than the other, and compound fractures in his leg, hip, and elbow. R. 10, 154. Grall's claims were initially denied on August 18, 2011, and upon reconsideration on October 13, 2011. R. 88-92, 95-97. On November 16, 2011, Grall requested a hearing before an administrative law judge. R. 98-99. On March 12, 2013, an ALJ hearing was held before ALJ Jeffrey LaVicka. R. 26-52. Grall testified at the hearing as did a vocational expert ("VE"). *Id.* In a written decision, on March 27, 2013, ALJ LaVicka found Grall "was not under a 'disability,' as defined in the Social Security Act . . . from the October 28, 2009, date of alleged disability onset through June 30, 2010, date upon

2

which he was last insured for a Period of Disability and Disability Insurance Benefits." R. 20. Grall appealed the ALJ's decision to the Appeals Council, which denied review on April 15, 2014. R. 1-5. Grall then, *pro se*, timely brought his claim to this Court.

**B. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's findings that Grall was no disabled from October 28, 2009, the date of the alleged disability, through June 30, 2010.

<u>1. Medical Evidence From October 28, 2009, to June 30, 2010</u>

For background, in 1986, Grall was struck by a vehicle resulting in compound fractures of his femur, a fractured hip, and other injuries including back pain. R. 233, 264.

On November 10, 2009, Grall visited The Pain Center, located in Weirton, West Virginia, "for a follow-up visit." R. 225. Records detail that Grall's "onset of low back pain has been chronic and has been occurring for years." *Id.* "The low back pain is described as moderate to severe" and Grall was noted to be using a cane. *Id.* Records also show that Grall's "back pain is relieved by heat and medication." *Id.* A physical examination of Grall's lumbar spine revealed tenderness, "decreased flexion, decreased extension and decreased lateral rotation." R. 226. However, Grall exhibited no swelling or edema and displayed "normal strength and tone, normal sensation bilaterally, no known fractures or deformities, normal posture, normal gait, normal coordination and normal reflexes." *Id.* Strength testing concluded that Grall was able to come to his toes and heels and stand on both legs without limitation. *Id.* Grall was recommended to follow-up in one month or as needed. R. 227.

On December 22, 2009, Grall again visited The Pain Center for a follow-up appointment. R. 222. Due to medication, Grall reported that his pain had decreased to a "tolerable level." *Id.* Grall

also denied any side effects from using medication. *Id.* Grall described pain in his lower back, left hip, left calf, and left elbow as "aching, burning and stinging." *Id.* A physical examination again revealed tenderness in Grall's lumbar spine, "decreased flexion, decreased extension and decreased lateral rotation." R. 223. Again, Grall exhibited no swelling or edema, and his strength, tone, posture, gait, reflexes, and coordination were listed as "normal." *Id.* Grall could come to his toes and heels and stand on both legs without limitation. *Id.* Grall was instructed to continue taking medication as prescribed. R. 224.

On January 11, 2010, Grall met with Richard A. Irvin, DO. R. 256. Grall met Dr. Irvin for treatment of his depression. *Id.* Dr. Irvin noted that Grall was taking Zoloft, but his pain had increased without taking Percocet and his blood pressure had risen. *Id*. Dr. Irvin wrote that Grall was "doing well on . . . Zoloft without side effect" and recommended Grall continue taking Zoloft. *Id.* On February 8, 2010, Grall was attended by Julia K. Fisher, PA-C, on behalf of Dr. Irvin for a blood pressure evaluation. R. 255. Grall's blood pressure was noted as "better" with no complaints of chest pain, headache, or swelling. *Id.*

2. Medical Assessments

On May 23, 2011, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment ("Physical RFC") of Grall. R. 274-81. Dr. Franyutti found that Grall could occasionally lift or carry up to twenty pounds and frequently lift or carry ten pounds. R. 275. Dr. Franyutti also found that Grall could stand or walk for about six hours in an eight hour workday and sit for about six hours in an eight hour workday. *Id*. The Physical RFC noted that Grall could occasionally perform all postural activities with the exception of climbing ladders, ropes, or scaffolds. R. 276. Dr. Franyutti concluded that Grall had no manipulative, visual, or communicative

4

limitations. R. 277-78. As to environmental limitations, Dr. Franyutti found that Grall should avoid concentrated exposure to extreme cold, extreme heat, vibration, fumes, odors, dusts, gases, poor ventilation, and other hazards such as machinery and heights. R. 278. On October 11, 2011, Narendra Parikshak, M.D., reviewed Dr. Franyutti's assessments and affirmed his findings. R. 347.

On June 15, 2011, Jim Capage, Ph.D., completed a Psychiatric Review Technique form. R. 282-95. Dr. Capage found Grall had a history of anxiety and a recent diagnosis of obsessive-compulsive disorder. R. 287. However, Dr. Capage found that Grall was only mildly restricted in performing activities of daily living and maintaining social functioning, concentration, persistence, or pace. R. 292. Ultimately, Dr. Capage concluded that Grall's "impairments are not severe" and "he retains the mental-emotional capacity to sustain work-like activities." R. 294. On October 10, 2011, Timothy Saar, Ph.D., affired Dr. Capage's findings "as written." R. 346.

3. Medical Records After June 30, 2010

From July 2010, to August, 2011, medical records detail follow-up appointments with Dr. Irvin for depression, elevated blood pressure, and hyperlipidemia. R. 254-56, 298-99.

On October 12, 2011, William R. Coburn, M.A., L.P.C., conducted a mental status examination of Grall. R. 231-234. Coburn concluded that Grall suffered from obsessive-compulsive disorder, severe trauma stemming from a motor vehicle accident, and "[s]tressors due to chronic pain and inability to work." R. 234. In November 2010, Coburn noted that after an increase of Zoloft, Grall's "moods are much more stable, and he is feeling a lot better." R. 235. In December 2010, Coburn stated that Grall "is not experiencing any side effects and is tolerating the medication quite well." *Id.* Coburn remarked that he intended to contact a pain management doctor to address Grall's leg and back pain. *Id.*

5

On March 1, 2011, Roland F. Chalifoux, D.O., evaluated Grall and noted that he suffered from a "post traumatic injury with tib fib fractures to the left leg[,] . . . [a]pparent depression with need for continued treatment for depression as well as cognitive behavioral therapy[,] . . . [and] [q]uestionable radiculopathy to the left lower extremity with need for further evaluation." R. 353. After undergoing injections in March and April 2011, in May 2011, Grall reported that, out of a scale of 1-10 for pain, his "back is 2-3, hip is a 5, and knee is an 8." R. 354-60. On May 27, 2011, Grall reported that "[h]is pain is about a 3 right now." R. 362. From June 2011 to February 2012, Grall underwent knee and hip injections and nerve ablations. R. 364-89. In October 2011, Dr. Chalifoux noted that Grall's pain has reduced to "a 2 for the ankle, 2 for the knee, and a 4 for the hip." R. 378. In March 2012, Grall underwent a MRI of his left knee at Ohio Valley Medical Center. R. 390-91. The MRI revealed "no definite evidence of a meniscal tear or fracture . . . [but] there is irregularity of the cortex of the medial femoral condyle which could be related to old trauma." R. 390.

**C. Testimonial Evidence**

Testimony was taken at the ALJ hearing held on December 13, 2012. R. 25-54. The following portions of the testimony are relevant to the disposition of this case.

<u>1. Grall's Testimony</u>

During the ALJ hearing, Grall testified that he lived with his wife, two children, and mother-in-law. R. 31-32. When his wife is at work, Grall stated that his mother-in-law takes care of his children. R. 32. Grall testified that he does not drive frequently and only attends his children's after school activities when he "feel[s] like [he] can go and not be in that much pain." R. 33-34. Grall testified that he has a GED. R. 35.

6

Grall testified that he has not worked since October 28, 2009. R. 37. Prior to that date, Grall stated that he has worked as a courier driver delivering mail for banks, a truck driver, a light laborer recycling ink cartridges, and a furniture deliverer for a furniture company. R. 40. Grall testified that pain in his left leg and lower back prevent him from working. *Id.* Grall additionally stated that he will feel burning and aching in his leg is he stands for too long and his left elbow will hurt if he "use[s] it too much." R. 41. Grall testified that he does not do any housework. R. 43. Grall stated that he walks with a cane and that his pain has worsened since 2011. R. 45.

2. The Vocational Expert's Testimony

A VE also testified at the hearing. First, the VE summarized Grall's past jobs. The VE labeled Grall's work as a courier as "sedentary . . . as performed" and unskilled; his position as a furniture deliverer as very heavy exertion and semi-skilled; his position as a cleaner for ink cartridges as sedentary; and his position as a delivery driver as medium exertion and semi-skilled. R. 48. Next, the ALJ asked the VE to

> assume a hypothetical individual of the same age, education and work experience as the claimant. Retains the capacity to perform sedentary work with a sit/stand option allowing the person briefly for one to two minutes, alternate sitting or standing positions at 15-minute intervals without going off task. Is limited to no foot control operations bilaterally. Who is limited to occasional posturals, except no climbing of ladders, ropes or scaffolds. No kneeling, crouching or crawling. Requires a hand-held assistive device only for uneven terrain or prolonged ambulation and the contralateral upper extremity can be used to lift and carry up to exertional limits. Must avoid concentrated exposure to extreme cold and heat. Must avoid concentrated exposure to wetness and humidity. Must avoid concentrated exposure to excessive vibration. Must avoid concentrated exposure to irritants. Most avoid all exposure to unprotected heights, hazardous machinery and commercial driving. Whose work is limited to simple, routine and repetitive tasks requiring only simple decisions with no fast paced production requirements and few workplace changes. Could such an individual perform the past work of the claimant as it was actually performed or as it is customarily performed per the DOT?

R. 49. The VE testified that the hypothetical individual could not perform the claimant's past work.

7

*Id.* However, the VE identified three unskilled and sedentary positions in the local economy that Grall could perform. R. 50. The VE testified that the typical employer permits two 15-minute breaks and one 30-minute lunch period. R. 50. The VE stated that being late to work is addressed by "a verbal warning followed by a written warning followed by termination." *Id.* The VE also testified that "absentee tolerance for unskilled work is typically up to one day per month and if exceeded on a continual basis would likely result in termination." *Id.* Lastly, the VE stated that a typical employer would tolerate an employee being "[u]p to 15 percent off task and if exceeded on a continual basis would like result in termination." R. 51.

### III. ALJ FINDINGS

In determining whether Grall was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. The first step in the process is determining whether a claimant is currently engaged in substantial gainful activity. § 404.1520(b). If the claimant is not engaging in substantial gainful activity, then the second step requires the ALJ to determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. § 404.1520(c). If the claimant has a severe impairment or combination of impairments, then the analysis moves to the third step in the sequence, which requires the ALJ to determine whether the claimant's impairments or combination of impairments meets or equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). § 404.1520(d). If an impairment meets or equals a listed impairment, the claimant is disabled. *Id.* However, if the impairment does not meet or equal a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the claimant's ability to do physical and mental work activities on a sustained basis despite the limitations of his impairments. § 404.1520(e).

8

After determining the claimant's RFC, the ALJ must determine, at step four, whether the claimant has the RFC to perform the requirements of his past relevant work. § 404.1520(f). If the claimant does not have the RFC to do his past relevant work, then he has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, at the final step in the process, that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experiences. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir.1983).

Here, as a preliminary matter, the ALJ determined that Grall met the nondisability requirements set forth in the Social Security Act "as to be insured for such benefits only through June 30, 2010." R. 13. At step one of the sequential process, the ALJ found that Grall had not engaged in substantial gainful activity since October 28, 2009, through June 30, 2010. *Id.* At step two, the ALJ found that Grall had the following severe impairments since October 28, 2009: disc herniation and stenosis of the lumbar spine; residual effects including left leg discrepancy and chronic pain; status post remote motor vehicle accident-related tibial fracture (stemming from a 1986 accident) and subsequent exicsion surgery (performed in 2004); degenerative changes in the left hip; affective disorder; and anxiety-related disorder. *Id.* At the third step, the ALJ found that none of Grall's impairments met or medically equaled the severity of any of the impairments contained in the Listings. R. 14. In order to consider step four of the process, the ALJ determined that, from November 11, 2012, through June 30, 2010, Grall had the following RFC:

> [A] capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; affords opportunity at least every 15 minutes to alternate between sitting and standing for up to 2 minutes, without breaking task; requires no operation of foot controls (bilaterally); requires no crawling, no crouching, no kneeling, no climbing of ladders, ropes or scaffolds, and no more than occasional balancing or climbing of ramps or stairs; accommodates use of a handheld

9

> assistive device only for prolonged ambnlatiou or negotiating uneven terrain, while maintaining availability of the opposite upper extremity to lift/carry up to the ascribed exertional limit; entails no concentrated exposure to temperature extremes, wetness or humidity, excessive vibration and irritants (e.g., chemicals, dust, fumes, gases, noxious odors, smoke) and no exposure to unprotected heights, hazardous machinery and commercial dtiviug; and is limited to simple, routine and repetitive tasks that require only simple decisions, impose no fast-paced production requirements and present few workplace changes.

R. 15. At step four, the ALJ found that, from October 28, 2009, through June 30, 2010, Grall was unable to perform any past relevant work. R. 18. However, at the final step, the ALJ found that, considering Grall's "age, level of education, work experience[,] and prescribed [RFC], he remained capable throughout the relevant period at issues . . . of performing jobs that exist in significant numbers within the national economy." R. 19. Therefore, the ALJ concluded that Grall was not disabled from October 28, 2009, through June 30, 2010, the date last insured.

## IV. MOTIONS FOR SUMMARY JUDGEMENT

### A. Contentions of the Parties

In his motion for summary judgement, Grall contests the ALJ's decision. In his motion, Grall provides some medical background and concludes that this "information should be considered as further proof that [his] injuries are very real and have caused him considerable pain." ECF No. 20 at 1. Grall claims that he cannot stand for long periods of time and must "continually sit down and elevate [his] leg." *Id.* Grall claims that no employer would allow him to take "continual breaks . . . in order to rest his back and leg." *Id.* Because Grall's occupational background was primarily manual labor and driving, Grall argues that the medication he "would have to take in order to lessen his pain" would not allow him to operate heavy machinery or drive. *Id.* Grall alleges that he cannot perform daily tasks such as bathing or shaving and "cannot attend family and children's functions on a regular basis due to pain." *Id.* at 2. Grall concludes that because of his medical condition, he

10

is unable to work full-time and should be considered disabled. *Id.*

In the Commissioner's motion for summary judgement, she argues that the ALJ's decision is supported by substantial evidence. ECF No. 22 at 9. Further, the Commissioner contends that the ALJ's RFC assessment "generously accounted for [Grall's] credibly established limitations . . . ."*Id.* at 10.

**B. The Standards**

<u>1. Summary Judgment</u>

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

<u>2. Judicial Review</u>

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable

amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

**C. Discussion**

In review of the *pro se* Plaintiff's motion, it appears that he make two general objections to the ALJ's written decision. First, Grall objects to the ALJ's ultimate RFC finding. Second, Grall objects to the ALJ's finding that he can perform certain jobs that exist in significant numbers within the economy, namely work as a "polisher."

1. The ALJ's RFC Determination

In his motion for summary judgement, Grall disagrees with the ALJ's finding that he has the residual functional capacity to perform sedentary work with certain physical limitations. R. 15. Grall argues that "[h]e cannot work full time" and "cannot perform daily activities . . . without having to take several breaks." ECF No. 20 at 2.

A Residual Functional Capacity, or RFC, is what a claimant can still do despite his limitations. 20 C.F.R. § 404.1545. A RFC is an assessment based upon all of the relevant evidence. *Id*. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of a claimant's medical condition. *Id.* Observations by

treating physicians, psychologists, family, neighbors, friends, or other persons of a claimant's limitations may be used. *Id*. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. *Id*. This assessment is not a decision on whether a claimant is disabled but is used as the basis for determining the particular types of work a clamant may be able to do despite their impairments. *Id*.

An ALJ is responsible for determining a claimant's RFC. An ALJ will "consider all [a claimant's] symptoms, including pain, and the extent to which [a claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the ALJ)." *Mastro v. Apfel*, 270 F.3d 171, 179 (4th Cir. 2001) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir.1987)). "The ALJ may discount subjective complaints 'if there are inconsistencies in the evidence as a whole.'" *Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) (quoting *Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir.2001)).

Here, substantial evidence supports the ALJ's RFC determination. The ALJ determined that Grall has a RFC to perform

> a range of work activity that: requires no more than a 'sedentary' level of physical exertion; affords opportunity at least every 15 minutes to alternate between sitting and standing for up to 2 minutes, without breaking task; requires no operation of foot controls (bilaterally); requires no crawling, no crouching, no kneeling, no climbing of ladders, ropes or scaffolds, and no more than occasional balancing or climbing of ramps or stairs; accommodates use of a handheld assistive device only for prolonged ambnlatiou or negotiating uneven terrain, while maintaining availability of the opposite upper extremity to lift/carry up to the ascribed exertional limit; entails no concentrated exposure to temperature extremes, wetness or humidity, excessive vibration and irritants (e.g., chemicals, dust, fumes, gases, noxious odors, smoke) and

13

> no exposure to unprotected heights, hazardous machinery and commercial dtiviug; and is limited to simple, routine and repetitive tasks that require only simple decisions, impose no fast-paced production requirements and present few workplace changes.

R. 15. In determining Grall's RFC, the ALJ considered his alleged symptoms and determined that he "had medically determinable impairments during the above period that could reasonably be expected to have produced some of the symptoms that he has alleged." R. 16. Yet, the ALJ concluded that Grall's "testimony and other attributed assertions of record concerning the intensity, persistence and limiting effects of such impairment-related symptoms during that period are . . . only partially credible." *Id.*

The ALJ noted that in October 2009, ALJ Sullivan found Grall able to perform "light exertional work activity . . . ." *Id.* The ALJ discussed that Grall's limitations in this claim "are only applicable to the period of just over eight months that followed the date of Judge Sullivan's finding" and "[t]here is arguably little objective, new and material evidence bearing upon [Grall's] condition prior to July 2010 that would appear to warrant any significant departure from the finding made in October 2009 by Judge Sullivan." *Id.* However, in this claim, instead of a "light work" restriction, the ALJ restricted Grall's RFC "to performing only 'sedentary' exertional work, with multiple, additional non-exertional limitations as indicated" in the RFC finding above. *Id.* The ALJ stated that his determination was "quite generous" given the short eight month gap of relevant time between Judge Sullivan's decision and the ALJ's finding in this case. *Id.*

During the relevant period, Grall had four medical appointments. Two visits, completed on November 10, 2009, and December 22, 2009, were follow-up appointments at The Pain Center to treat Grall's "chronic back pain." R. 222-27. During the November 10, 2009, appointment, records describe Grall's pain as "moderate to severe" with "aching, burning and stabbing" sensations in his

lower back. R. 225. Records note that Grall's back pain "is relieved by heat and medication." *Id.* A physical examination on November 10, 2009, revealed "tenderness to palpation . . . decreased flxion, decreased extension and decreased lateral rotation." *Id.* However, strength testing revealed that Grall "can come to toes, can come to heels" and can stand on either leg "without limitation." *Id.* During the December 22, 2009, appointment, Grall reported that medication decreases his "pain to [a] tolerable level" without side effects. R. 222. A second physical examination revealed similar findings to the November 10, 2009, examination. R. 223, 226. The other two appointments during the relevant period, completed on January 11, 2010, and February 8, 2010, were follow-up appointments with Dr. Irvin for depression. R. 255-56. During the January 11, 2010, appointment, Dr. Irvin noted that Grall had high blood pressure, however "[h]is mood is improved" and "[h]e is out and active." R. 256. On February 8, 2010, Grall's blood pressure was reported to be "better" and had no symptoms of chest pain, headache, or swelling. R. 255.

The ALJ discussed that "two State Agency physicians concluded as of May, August and October 2011 that [Grall] remained capable of performing even 'light' exertional work activity, as had . . . Judge Sullivan in October 2009." R. 18. On August 12, 2011, over a year beyond the relevant period in this claim, Dr. Franyutti concluded that Grall "is capable of performing light work." R. 296. On October 11, 2011, Dr. Parikshak found no new evidence in the medical record "to suggest increased functional limitations" and affirmed Dr. Franyutti's May 2011 Physical RFC. R. 347. The ALJ also discussed that "two State Agency psychological consultants in June and August 2011 found [Grall] to evidence no 'severe' psychological impairment, also consistent with the finding of Judge Sullivan in October 2009." R. 18. On June 15, 2011, Dr. Coburn concluded that Grall's mental "impairments are not severe." R. 294. On October 10, 2011, Dr. Saar stated that he

15

"reviewed all the [medical evidence] in the file" and affirmed Dr. Coburn's finding "as written." R. 346.

Further, the ALJ found Grall not credible as "to his subjective, impairment-related complaints." R. 18. In support of his finding, the ALJ noted some inconsistencies in the record. The ALJ discussed that during the ALJ hearing, Grall contended that he is unable to care for his children and, instead, his mother-in-law cares for his children when his wife is at work. R. 17, 32. However, during a session with Dr. Coburn, Grall reported that he was "Mr. Mom, staying home and taking care of the children while [his wife] goes out and earns the money to support the family." R. 17, 233. Additionally, the ALJ noted that Grall's "overall employment record, multiple disability and workers' compensation filing invite reasonable questions with regard to his historical inclination, motivation, or need to seek and sustain full-time employment." R. 17.

Therefore, based on a review of the record, substantial evidence supports the ALJ's RFC finding.

2. The ALJ's Finding as to Jobs Plaintiff Could Perform in the Economy

Grall states that "[t]he commissioner has also indicated that Mr. Grall could get a job in which he polished cars and similar types of employment." ECF No. 20 at 1. However, Grall contends that he could not perform the requirements of this position because he "cannot stand for extended periods of time" and "must continually sit down and elevate his left leg." Id.

At the final step of the five-step evaluation process to determine disability, the ALJ found that, considering Grall's "age, level of education, work experience[,] and prescribed [RFC], he remained capable throughout the relevant period at issue . . . of performing jobs that exist in significant numbers within the national economy." R. 19. In his opinion, the ALJ listed three

16

sedentary and unskilled positions–"polisher" (DOT 713.684-038), "order clerk" (DOT 209.567-014, and "ticket checker" (DOT 219.587-010)–available in the regional and national economy that Grall could perform. R. 19.

Based on a review of the record, it appears that Grall contests the ALJ's finding that Grall could perform the work of a "polisher." R. 19. However, it seems Grall is mistaken about what the "polisher" position entails. Grall refers to the "polisher" position as "polish[ing] cars[,]" yet according to the Dictionary of Occupational Titles, the "polisher" position referred to by the VE during the ALJ hearing refers to work

> Polish[ing] plastic eyeglass frames and temple pieces to remove scratches and pit marks, using polishing wheel: Appl[ying] abrasive compound to wheel surface, using brush. Start[ing] machine and holds and turns frame parts against wheel to polish parts and remove defects. Inspect[ing] and feel[ing] polished parts to verify removal of flaws. Press[ing] sandpaper against polishing wheel to remove abrasive residue in preparation for next sequence.

U.S. DEPARTMENT OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES (4th Ed., Rev. 1991), available at http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT07B.HTM; ECF No. 20 at 1. Further, according to the VE, the "polisher" position is an unskilled sedentary position consistent with other sedentary positions listed during the ALJ hearing. Therefore, based on the ALJ's overall RFC finding, substantial evidence supports that Grall could perform the work of a "polisher" as well as other jobs that exist in significant numbers in the national economy as listed by the ALJ in his written opinion. R. 19.

Lastly, Grall argues that he "cannot stand for extended periods of time" and must "continually sit down and elevate his left leg." Therefore, in addition to side effects from pain medication, he would be unable to operate "heavy machinery or driv[e] . . . while taking said medication." ECF No. 20 at 1. Yet, Grall's RFC accommodates these restrictions. In the RFC, Grall

is limited to sedentary work and provided the "opportunity at least every 15 minutes to alternate between sitting and standing for up to 2 minutes" and cannot be exposed to hazardous machinery or commercial driving, among other hazards. R. 15.

## V. RECOMMENDATION

For the reasons appearing above, the undersigned finds that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT** Grall's motion for summary judgement, ECF No. 20, be **DENIED**, and the Commissioner's motion for summary judgment, ECF No. 21, be **GRANTED**.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this report and recommendation, file with the Clerk of the Court written objections identifying the portions of the report and recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the report and recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: June 3, 2015 /s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE